1  **WO**

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Mark Starling, M.D., | No. CV-16-00708-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Banner Health, an Arizona corporation; Marjorie Bessel, M.D.; Julie Nunley; Cindy Helmich; and Lori Davis-Hill, | |
| Defendants. | |

## TABLE OF CONTENTS

I.  SUMMARY JUDGMENT STANDARD ................................................................ 1

II.  FACTUAL BACKGROUND ........................................................................... 2

   A.  Starling's First Decade at Banner ........................................................ 2

   B.  Allegations Mount Against Starling ..................................................... 3

   C.  Starling Accuses Banner of Discrimination .......................................... 6

   D.  The Holiday Party and Starling's Termination ..................................... 7

   E.  The Report to the Medical Board ........................................................ 11

   F.  This Action ..................................................................................... 12

III.  ANALYSIS: SUMMARY JUDGMENT ........................................................ 12

   A.  Count I (Banner): Violation of ADEA – Age Discrimination – Termination of Employment ............................................................................................ 12

      1.  Starling's *Prima Facie* Case ....................................................... 13

2. Banner's Proffered Nondiscriminatory Rationale ............................................. 16

3. Starling's Argument for Pretext ....................................................... 16

B. Counts II, VI, and X (Banner): Violation of ADEA – Retaliation ..................... 17

1. Count II: Termination of Employment ........................................... 18

2. Count VI: Performance Improvement Plan ....................................... 19

3. Count X: Complaint to the Arizona Medical Board ......................... 20

C. Count III (Banner): Violation of ADA – Disability Discrimination – Termination of Employment ................................................................................................ 20

D. Count IV (Banner, Bessel, and Nunley): Violation of AEPA – Retaliation – Termination of Employment ........................................................................... 21

E. Count V (Banner, Bessel, and Nunley): Violation of AEPA – Retaliation – Termination of Employment ........................................................................... 22

F. Count IX (Banner, Bessel, Nunley, Davis-Hill, and Helmich): Invasion of Privacy – Intrusion Upon Seclusion ............................................................... 23

G. Counts VII and VIII (Banner, Bessel, and Nunley): Defamation – False Statements Regarding Job Performance ....................................................... 25

H. Count XI (Banner and Bessel): Defamation – False Statements in Complaint to the Arizona Medical Board ............................................................................ 25

1. Defamation Generally .................................................................. 25

2. The Duty to Report and Qualified Privilege ................................. 25

3. Bessel's Letter to the Board ......................................................... 26

IV. STARLING'S RULE 56(d) MOTION .................................................................. 28

A. Comparator Discovery ......................................................................... 28

B. Depositions of Decision-Makers ......................................................... 29

C. Waiver of Privilege .............................................................................. 30

V. CONCLUSION ....................................................................................................... 30

Before the Court is Defendants Banner Health, Marjorie Bessel, M.D., Julie Nunley, Cindy Helmich, and Lori Davis-Hill's Motion for Summary Judgment (Doc. 218), the Response, and the Reply. Also before the Court is Plaintiff's Motion Pursuant to Federal Rule of Civil Procedure 56(d) (Doc. 243), the Response, and the Reply. For the reasons below, Defendants' motion will be granted in part and denied in part, and Plaintiff's motion will be denied.

## I.     SUMMARY JUDGMENT STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial. Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

It is the moving party's burden to show there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Upon such a showing, however, the burden shifts to the non-moving party, who must then "set forth specific facts showing that there is a genuine issue for trial" without simply resting on the pleadings. *Anderson*, 477 U.S. at 256. To carry this burden, the nonmoving party must do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* at 587. "A court must view the evidence 'in the light most favorable to the [non-moving] party.'" *Tolan v. Cotton*, — U.S. —, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249).

## II. FACTUAL BACKGROUND

The following facts are construed in the light most favorable to the plaintiff, the non-moving party.

### A. Starling's First Decade at Banner

In October 2004, Banner Health ("Banner") hired Dr. Mark Starling ("Starling") to serve as the Medical Director of Banner Baywood Heart Hospital. (Doc. 219 at ¶ 1.) He was 56 years old and had previously been a tenured professor of medicine at the University of Michigan. (*Id.* at ¶ 2; Doc. 210 at ¶ 2.)

Dr. John Hensing supervised Starling during his time as Medical Director. (Doc. 219 at ¶ 3.) Starling's performance, in Hensing's eyes, "exceed[ed] or frequently exceed[ed]" expectations. (*Id.* at ¶ 4.) In 2006, Starling was promoted to Chief Medical Officer. (*Id.* at ¶ 5.)

Dr. Marjorie Bessel ("Bessel") became Starling's direct supervisor in 2010. (*Id.* at ¶ 6.) She was 47. (*Id.*, Ex. B at ¶ 4.) Overall, Starling continued to receive positive performance reviews. (Doc. 219 at ¶ 7.) But in October 2012, Bessel and the Hospital's then-CEO, Laura Robertson, placed Starling on a performance improvement plan, which Robertson emailed to him. (*Id.*, Ex. C at Ex. 2.) Starling was expected to become more involved in clinical aspects at the Hospital; to improve his "communication in delivery and accuracy of information," including avoiding "[v]isible signs of exacerbation [*sic*]" such as throwing his hands up; to delegate more effectively; and to "[a]ctively engage as a senior leader." (*Id.*) Robertson says that she delivered the document during a meeting. (Doc. 219, Ex. C at 52:5-8.) Starling claims he never received any sort of performance improvement plan or any similar document in 2012. (Doc. 267, Ex. 2 at ¶ 16.) He admits only that Robertson expressed concern about Starling's outside speaking engagements affecting his obligations to the hospital. (*Id.* at ¶ 17.) Regardless of whether Starling was aware of the plan, Defendants contend that Starling made "sufficient progress" to end it. (Doc. 219 at ¶ 10.) Robertson also recalls several accusations of bias against Starling. (Doc. 267, Ex. 6 at 207:4-23; 211:19-212:7.)

Otherwise, Robertson appears to have been quite satisfied with Starling's performance. Robertson says that Starling was, more than once, responsive to the concerns she expressed. (*Id.* at 109:18-110:4; 134:18-135:8.) On June 5, 2014, Robertson texted Starling, "Thanks so much for your help. I truly appreciate your courageous leadership and doing the right thing! You are a great partner!!" (*Id.* at 151:23-152:18.) On October 21, 2014, she provided Starling with positive comments at a budget review and, later that day, responded to his grateful text with this message: "You are a great leader and it's a privilege to work with you." (*Id.* at 156:22-157:23.) Plaintiffs attach as exhibits seven notes of encouragement and gratitude, most of which were handwritten, from Robertson to Starling. (*See id.* at Exs. 12-18.) The dates are sometimes unclear, but Robertson contests the veracity of none. In fact, she acknowledges in her deposition that she found Starling to be a great leader and partner. (Doc. 267, Ex. 6 at 169:6-12.)

Robertson was not the only one who appreciated Starling's work. Each year, Banner gives certain employees the Guardian Award. Those who best embody Banner's virtues—"wisdom, warmth, strength, integrity and gentleness"—receive the honor. (Doc. 267, Ex. 16.) There is a competitive selection and interview process. Starling was nominated "multiple times" throughout his time at Banner and won the award in November 2014. (Doc. 267, Ex. 2 at ¶ 15.)

**B.      Allegations Mount Against Starling**

In March of 2015, Julie Nunley ("Nunley") became the Hospital's CEO. (Doc. 219 at ¶ 11.) Shortly thereafter, Dr. Joseph Chatham, the Hospital's Chief of Staff, met with Nunley. The parties dispute who approached whom. Chatham accused Starling of being uncollaborative, dictating his own agenda without input, playing favorites with staff members, and sending physicians' cases to peer review selectively. (*Id.* at ¶ 12.) Starling believes that Chatham was biased against him because of a dispute the two had regarding the (negligent, according to Starling) credentialing of Chatham's son, also a

doctor, for a particular procedure. Starling ultimately won that fight, as Banner took his side. (Doc. 267, Ex. 2 at ¶¶ 172-203.)

For her part, Nunley also claims that she saw Starling "slam his fist down on a table" at a medical staff meeting. (Doc. 219, Ex. D at ¶ 3.) Starling denies this, but he does so only insofar as to deny he slammed his fist at a meeting with the Chief of Anesthesiology, Dr. George Scott Gieszl, Jr. (Doc. 267, Ex. 20 at 10-11.) Starling suggests that this is the only candidate for Nunley's supposed misremembrance.

Perhaps the fist-slamming accusation stems back to Robertson. Robertson kept notes during her tenure as CEO. On one occasion, she noted that Starling "scream[ed] at Giesle [*sic*] in the hallway." (Doc. 267, Ex. 6 at 87:23-88:3.) She says Gieszl heard Starling screaming in the hallway. (*Id.* at 88:8-12.) Yet Gieszl swears in a declaration that in his ten years of working with Starling, he never "saw him act inappropriately" or "unprofessionally." (Doc. 267, Ex. 7 at ¶¶ 8-9.) During a disagreement over peer review for anesthesiologists, Gieszl felt all involved conducted themselves properly at all times. (*Id.* at ¶¶ 11-15.)

Starling also made a habit of sending what Defendants describe as unprofessional emails. (Doc. 218 at 3.) For example, on October 12, 2014, Starling sent an email to Banner Health's Vice President of Operations for the Arizona Region: "Why are you interfering in our process in the [ ] transfer process. You . . . are delaying care." The Vice President responded, "I don't have any idea what you're talking about and I don't appreciate getting a note like this. If you have specific concerns, I'd like to know what they are and have them addressed in a collaborative, constructive manner." (Doc. 219 at ¶ 15.) Starling admits that the email "doesn't invite collaboration." (Doc. 219, Ex. A at 192:18-21.) He later explained his specific concerns in a follow-up email. (Doc. 219, Ex. A, Ex. 13.) Further, he claims to have communicated those concerns in a meeting prior to sending the email. (Doc. 267, Ex. 2 at ¶¶ 22-23.)

Another exchange occurred on December 31, 2014, when Banner's Peer Review Quality Director emailed Starling to ask about system-wide changes, including new

software, that the company was making to the peer-review process. She noted that she had an invitation on her "calendar for a peer review meeting on January 7th," and she wanted to be "prepared to support [Starling's] team and the peer review process at [the Hospital]." (*Id.*, Ex. B at Ex. G.) Starling replied, "You need to watch and learn on the 7th how a true [Peer Review Council] functions. This activity will remain untouched." (*Id.*) After noting that he was dissatisfied with the changes and tersely demanding training resources, he concluded, "Why this had to be made so difficult is beyond me at this point. Happy New Year." (*Id.*) The Quality Director's supervisor later forwarded the email to Bessel, expressing concern: "Given Dr. Starling's response below, I am uncertain if he was able to garner support from the local team. I am concerned this will undermine the process." (*Id.*)

In addition, Defendants assert that Starling failed to attend several meetings. Throughout the year of 2014, they claim, Starling attended only two of the eleven Chief Medical Officer/Chief of Staff system peer review council meetings. (Doc. 219 at ¶ 18.) He also missed a physician succession meeting with Robertson. Yet Starling claims that he did attend more than two meetings—sometimes dialing in via phone, in which case his attendance would not be recorded. (Doc. 267, Ex. 2 at ¶ 224.) Starling's assistant avers that during the two years she worked for him, he "always communicated very well . . . about his ability, or inability, to attend meetings for which he was scheduled." (Doc. 267, Ex. 12 at ¶ 7.)

Bessel accuses Starling of having been often unprepared to discuss items at the meetings he did attend. (Doc. 219 at ¶ 22.) Starling disputes this last point, asserting that he "always made a good-faith effort to be prepared for [his] meetings." (Doc. 267, Ex. 2 at ¶ 232.) He vigorously contests one particular instance in which Bessel accused him of being unprepared to discuss a lab project. (Doc. 267, Ex. 21 at 19-21 (written statement supplied to Banner as part of its later investigation into Starling's claims of age discrimination).)

Bessel and Starling had regularly monthly meetings. Some of these meetings occurred on January 27, 2015, February 11, 2015, and May 29, 2015. (Doc. 219 at ¶ 23.) During these meetings, the two discussed what Bessel felt was the inappropriate tone of the emails above. Starling claims that he apologized to the persons to whom he sent the messages, but he contends that "Bessel acted as if the [emails] were minor issues." (Doc. 267, Ex. 2 at ¶ 35.) He also does not believe the tone of the emails was inappropriate. (Doc. 267, Ex. 21 at 5-9.)

At a June 4, 2015 meeting with Chatham and Nunley, Chatham told Starling that he did not believe Starling was objective. (Doc. 267, Ex. 2 at ¶ 217; Doc. 219 at ¶ 25.) Nunley became concerned that Starling had a fractured relationship with the medical staff. (Doc. 219 at ¶ 25.) Starling responds now by pointing to declarations from three colleagues of many years, all of whom swear to his professionalism and decorum. (*See* Doc. 267 at Exs. 9-11.) And again, he casts aspersions on Chatham, insinuating that Chatham disliked Starling because of the dispute with Chatham's son. (Doc. 267 at ¶ 25 (citing various places in the record).)

### C.     Starling Accuses Banner of Discrimination

As early as June 9, 2015, Bessel was investigating whether Starling's investment/retirement plan had vested and planning for a "soft landing" package—though Defendants do not explain what this package entailed. (Doc. 267, Ex. 5 at Ex. 8; Doc. 267, Ex. 5 at 111:6-21; Doc. 267, Ex. 34; Doc. 291 at 7.) On or around the day before, June 8, 2015, Starling met with Bessel and Nunley to discuss his performance issues. Defendants assert that Bessel told Starling he would be placed on a "non-disciplinary" Performance Improvement Plan ("PIP"). (Doc. 219 at ¶ 27.) Starling claims that the conversation was actually quite hostile, with Bessel saying, "We have no confidence that you can meet our expectations as [Chief Medical Officer]." (Doc. 267, Ex. 2 at ¶ 55.) According to Starling, Bessel continued: "One more mistake and you're fired." (*Id.* at ¶ 56.) Starling says the conversation "frightened [him] into retaining legal counsel that same day." (*Id.* at ¶ 61.)

On June 16, 2015, Starling met with Banner's General Counsel to file an internal complaint of discrimination as a result of the meetings with Bessel and Nunley. (Doc. 267, Ex. 2 at ¶ 68.) He claims that Bessel and Nunley immediately began to treat him with hostility, ignoring his salutations, walking away from him, and excluding him from meetings. Both appeared to be angry, at least as he saw it, when they did talk to him. (*Id.* at ¶¶ 74-78.)

Nine days after the June 8 meeting, on June 17, 2015, Starling's counsel sent Banner a letter accusing it of attempting to force Starling into retirement. (Doc. 219 at ¶ 28.) Banner investigated the allegation internally, and its Senior Director of Human Resources concluded that there was no evidence of harassment or discrimination. (*Id.* at ¶ 29.) Starling contests the internal investigation procedures, alleging that the investigator asked only leading questions and cherrypicked witnesses and facts. (Doc. 267, Ex. 2 at ¶¶ 79-84.)

On October 28, 2015, after Banner's investigation concluded, the PIP went into effect. Defendants claim that the PIP "was neither a disciplinary measure nor 'corrective action.'" (Doc. 219 at ¶ 30.) Starling told Bessel that he thought the PIP "was age discrimination and retaliation." (Doc. 267, Ex. 2 at ¶¶ 85-89.) Around November 10, 2015, Starling's counsel sent notice of intent to file suit. (*See* Doc. 267, Ex. 26.)

### D.     The Holiday Party and Starling's Termination

Banner held its annual employee recognition holiday function at Banner Baywood Medical Center on December 15, 2015. There were multiple meals served so that Banner employees who worked later in the day could partake in the festivities.

Defendants assert that, as Chief Medical Officer, Starling "was required to work" at the function. (Doc. 219 at ¶ 31.) Nunley's assistant had emailed members of Hospital management, including Starling, and stated, "All c-suite will be attending and assisting with [the] meals please [*sic*] sign up for the best times that will work for you." (*Id.* at ¶ 32.) Starling asserts that he attended the function of his own accord and did not view it as work/an obligation. (Doc. 267, Ex. 2 at ¶ 137-40.) He further notes that he had

declined many times to work the event in the past and "was never disciplined or otherwise admonished in any way." (*Id.* at ¶ 146-47.) In his words, "No one ever told me I was required to attend the holiday meal. Nothing ever led me to believe that my attendance was required at the holiday meal." (*Id.* at ¶ 148.) Starling's assistant swears that "no one ever told [her that Starling] was required to attend the holiday meal and serve meals to staff." She always had the impression that doing so was optional. (Doc. 267, Ex. 12 at ¶¶ 14-15.)

On the evening of the holiday party, Starling had three eight-ounce glasses of wine between 6:00 pm and 8:00 pm. (Doc. 219 at ¶ 36.) Starling emphasizes that he consumed two of these glasses while eating his dinner, "a healthy portion of chicken, rice, and vegetables." (Doc. 267, Ex. 2 at ¶ 93.) He also had "two cups of coffee and ate dessert." (*Id.* at ¶ 95.) He further points out that, at the time, he weighed approximately 190 lbs. and "would typically drink 1-2 glasses of wine with dinner, 2-5 times per week." (*Id.* at ¶¶ 148-49.) He thus believes that the wine did not in any way affect him. (Doc. 219, Ex. A at 20:9-21.)

In any case, at around 10:30 pm, Starling drove himself to the party, arriving at about 11:00 pm. (Doc. 219 at ¶ 37.) Alcohol was not being served at the event. (*Id.* at ¶ 38.) Again, Starling never signed up for a shift and decided, apparently spontaneously, to attend. (Doc. 267, Ex. 1 at Ex. 3; Doc. 267, Ex. 28 at 5.) He also points out that he had been up since 5:00 am. (Doc. 267, Ex. 2 at ¶ 90.)

From this point, the stories diverge wildly. Cindy Helmich ("Helmich"), Chief Nursing Officer at Banner Baywood Medical Center, went to say hello to Starling. She says she could smell alcohol on Starling's breath. His speech cadence was off, and his words were unclear. Further, his arms were "swaying back and forth" more than normal, he was stepping back and forth, and he was "very animated." (Doc. 267, Ex. 3 at 77:6-78:18.) Otherwise, Helmich remembers almost nothing about it. (*See id.* at 75:23-86:25.) Some time passed, less than an hour but maybe more than a half-hour, before Helmich reported this to Nunley. (*Id.* at 84:12-20.) Lori Davis-Hill ("Davis-Hill"), the

Hospital's Chief Human Resources Officer, spoke to Starling at Nunley's request. Davis-Hill "observed that there was an odor that could be the odor of alcohol." She further explained that "the cadence of [Starling's] speech was not what [she was] used to hearing from him. . . . [W]hen he was speaking, he would lose track of his thought and pause, and then come back into the conversation." He did not, however, slur his speech. (Doc. 219, Ex. F at 75:1-76:23.)

Starling tells a different tale. He insists he was sober. Apart from the other administrators and staff members he talked to at the event who apparently did not notice his tipsiness, Starling points out that at one point he performed a feat that would be almost impossible if he were intoxicated. Erin Leuthold, Director of the Cardiac Progressive Care Unit, suggested that they take some meals to staff members who were unable to make it over to the cafeteria. Leuthold "obtained a very large serving platter" upon which she placed four meals. The meals were on plates, with other plates turned upside down to cover them. Starling took the tray over to the dessert table and balanced desserts on top of the upside-down plates. As Starling and Leuthold were leaving, Davis-Hill asked if she could join. Starling carried the tray to an elevator, exited the elevator, walked down "a long hallway," got on another elevator, and then "walked the entire B and C units of the 4th floor." In Starling's words, "During this entire time, I carried the heavy platter with four meals on it balancing desserts on top of those meals. At no time did I ever stumble or display anything that can be viewed as any kind of impairment." He recalls that the whole process took about 45 minutes before he returned to the cafeteria. (Doc. 267, Ex. 2 at ¶¶ 90-104.) Davis-Hill acknowledges that she walked with Starling, but she does not recall how much he carried. (Doc. 267, Ex. 4 at 85:14-16.) She says he *did* stumble, but she cannot say it was from having been drinking. (*See id.* at 89:23-90:8.) Finally, Starling emphasizes that he spoke to at least four other persons, in addition to those to whom he served food, who did not complain about his demeanor at the holiday party. (Doc. 267, Ex. 2 at ¶ 99.)

Whichever story is correct, at around 1:00 am, Helmich and Davis-Hill approached Starling and told him to accompany them to an empty conference room. (Doc. 219 at ¶ 43.)  On the way, when Starling asked why he had been pulled aside, Helmich responded that someone claimed to have smelled alcohol on his breath.  (Doc. 267, Ex. 2 at ¶¶ 106-07.)  Starling says that, prior to the technician arriving, no one asked him for his consent.  (*Id.* at ¶ 112.)  The non-Banner-affiliated technician arrived around 2:30 am and administered a breathalyzer test, which showed a blood-alcohol content of .043.  (Doc. 219 at ¶ 50.)  According to Starling, the technician also asked for a urine sample while he recalibrated the breathalyzer to run the test again.  (Doc. 267, Ex. 2 at ¶¶ 117-18.)  Defendants claim, without adequate citation, that Starling consented to the testing before it began.  (Doc. 219 at ¶ 46.)  The result of the second breathalyzer test was almost identical to the first.  (Doc. 267, Ex. 2 at ¶ 121.)  Starling claims that the technician asked him to sign a piece of paper confirming that his blood-alcohol content exceeded .02, the cutoff point for a violation of Banner's policy.  (*Id.*)  That paper included an indemnity provision, in which the signor agrees to "hold harmless, the laboratory, collection facility, above named company, and their agents or representatives from any and all liability arising from this testing and any decision made concerning . . . continued employment based upon the results of these tests."  (Doc. 219, Ex. A at Ex. 5.)  Starling further claims that the technician would not allow him to leave unless he signed the paper, which is the sole reason he signed it.  (Doc. 267, Ex. 2 at ¶ 121.)  The technician did not ask him to explain why his blood-alcohol content might have been elevated.  Alternative explanations include, according to Starling, medications, lip balm, and mouthwash with alcohol content.  The technician also did not offer alternative testing procedures.  (*Id.* at ¶ 122.)

Banner had itself served alcohol at various work-related functions in the past.  For example, alcohol was sometimes served at the Guardian Award ceremony.  (Doc. 267, Ex. 6 at 27:6-8.)  Part of former-CEO Robertson's job was to speak at the ceremony.  (*Id.* at 27:14-18.)  She consumed alcohol when attending and was never disciplined for doing

so. (*Id.* at 27:23-28:7.) Nor did she have to submit to a drug and alcohol test. (*Id.* at 30:4-6.) Further, she was unaware of other attendees at the ceremony or at meetings where alcohol was served who were disciplined or had to submit to testing as a result of the drinking. (*Id.* at 30:17-31:15.) Jill Patterson, Vice President of Human Resources, admits that Banner served alcohol to its employees at an annual leadership conference and an event honoring hospital donors. (Doc. 267, Ex. 5 at 131:18-133:13.) Helmich also recalls alcohol being served at certain Banner events. (*See* Doc. 267, Ex 3 at 183-86.)

Nevertheless, on December 17, 2015, Banner terminated Starling's employment. (Doc. 219 at ¶ 56.) Defendants claim that "[p]er Banner's Employee Drug and Alcohol Policy, an employee with a blood alcohol content of .02 or greater is in violation of the policy and immediate termination is required." (*Id.* at ¶ 55.) Starling was 67 at the time he was terminated. (*Id.* at ¶ 56.) He was replaced by Dr. Paul Hurst, a 60 year-old physician. (*Id.* at ¶ 57.)

### E.     The Report to the Medical Board

On December 28, 2015, Bessel sent to the Arizona State Board of Medical Examiners ("Board") a letter detailing the incident at the holiday party. (Doc. 267, Ex. 5 at Ex. 10.) She prefaced the letter by explaining that an Arizona statute requires hospitals to report "any information that appears to show that a physician is or may be unable to engage safely in the practice of medicine." (*Id.*) The relevant factual portion stated as follows: "During the night shift meal on 12/14/15, Dr. Starling was reported to have smelled of alcohol and to have stumbled. His speech differed from its normal pattern. Per policy, Dr. Starling was required to undergo, and did complete, testing. The testing was positive for alcohol above Banner's acceptable level." (*Id.*) She specifically requested that the Board maintain confidentiality in the matter. (*Id.*) The Board eventually informed Starling that it determined that he had not violated the Arizona Medical Practice Act and dismissed the case.

**F.     This Action**

Starling filed a charge of discrimination with the Equal Opportunity Employment Commission on January 4, 2016.  (Doc. 216 at ¶ 168.)  He filed this suit on March 15, 2016.  On April 25, 2016, the EEOC issued a Notice of Right to Sue Letter.  (*Id.* at ¶ 171.)

## III.     ANALYSIS: SUMMARY JUDGMENT

In evaluating the discrimination claims in this case, the Court bears in mind the following guidance from the Ninth Circuit:

> A plaintiff alleging employment discrimination need produce very little evidence in order to overcome an employer's motion for summary judgment.  This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.  In evaluating motions for summary judgment in the context of employment  discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses.

*Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation marks and citations omitted).

### A.     Count I (Banner): Violation of ADEA – Age Discrimination – Termination of Employment

Starling claims that he was terminated because of his age.  (Doc. 210 at ¶ 220.) The Age Discrimination in Employment Act of 1967, as amended ("ADEA"), prohibits an employer from discriminating against an individual because of the individual's age. 29 U.S.C. § 623(a).  ADEA claims proceed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework.  First, a plaintiff must establish a *prima facie* case of discrimination.  If he does so, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for their conduct.  Should the defendants succeed, the burden shifts back to the plaintiff to demonstrate that the proffered nondiscriminatory reason is a pretext for discrimination.  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 888-89 (9th Cir. 1994).

- 12 -

### 1. Starling's *Prima Facie* Case

"The requisite degree of proof necessary to establish a prima facie case for . . . ADEA claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.* at 889. "To establish a *prima facie* case using circumstantial evidence, [ ] employees must demonstrate that they were (1) members of the protected class (at least age 40); (2) performing their jobs satisfactorily; (3) discharged; and (4) replaced by substantially younger employees with equal or inferior qualifications." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000).

Starling has established a *prima facie* case. He was 67 at the time he was terminated and was thus a member of the protected class. He was performing his job satisfactorily. His own positive assessment of his performance is relevant in so determining. *See Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002) ("[A]t the *prima facie* stage, [ ] self-assessment of [ ] performance is relevant."). Further, his official performance reviews from Banner were always satisfactory or better.

That is not to say there were no problems. The tangled web of facts in this case indicates a clash of strong personalities. But Defendants routinely emphasize throughout their briefing that the improvement plans were non-disciplinary. As discussed below, they do so to show that there is no evidence of retaliation against Starling. But the lack of disciplinary proceedings might show, in addition or in the alternative, that Starling's performance as an employee was so strong that nothing he had done warranted discipline. A reasonable juror could so conclude. Being told about areas for improvement is a reality of professional life. If Starling were truly a troublesome employee, Banner could have disciplined him. Instead, its agents consistently gave him very good reviews. Defendants cannot have it both ways. If improvement plans are not adverse employment actions, they cannot be evidence that Starling was a poor employee.

Defendants also fail to demonstrate that Starling's demeanor had changed over time. Starling claims, for example, that the tone of his emails was consistent throughout his employment. (Doc. 267, Ex. 2 at ¶¶ 25, 32.) Davis-Hill also admits that members of the independent medical staff never complained to her, the Chief Human Resources Officer, about Starling in any way. (Doc. 267, Ex. 4 at 40:23-41:1.)

Starling satisfies the other elements of the *prima facie* case as well. He was discharged and replaced by a younger employee—although arguably not a substantially younger one, as Starling was 67 and Hurst, his replacement, was 60. But that is not the end of the inquiry. In *Douglas v. Anderson*, 656 F.2d 528 (9th Cir. 1981), the court found the plaintiff "proved that he was a member of the protected class, was discharged, and was replaced by a person five years younger than he. Further, he produced substantial evidence of satisfactory job performance. This was sufficient to establish a *prima facie* case and shift the burden . . . ." *Id.* at 533. The Court finds Starling's circumstances are similar enough to end the *prima facie* inquiry. In addition, few persons qualified for Starling's job—overseeing other doctors—are going to be young. It is plausible that Banner preferred a Chief Medical Officer who likely had ten years before retirement as opposed to three.

Contrary to Defendants' argument, this holding does not conflict with *France v. Johnson*, 795 F.3d 1170 (9th Cir. 2015), in which the circuit adopted a "rebuttable presumption" approach: "We hold that an *average* age difference of ten years or more between the plaintiff and the replacements will be presumptively substantial, whereas an *average* age difference of less than ten years will be presumptively insubstantial." *Id.* at 1174 (emphases added). *France* was a case, as the preceding sentence demonstrates, about a slew of new promotions and the *average* age of the promotees. It does not draw a bright-line rule about age in the run-of-the-mill, single termination case. And even if it did, the analysis did not end there: the court examined additional evidence, direct and circumstantial, that the employer considered the employee's "age to be significant." *Id.*

Defendants tacitly concede that Starling was one of the two oldest Chief Medical Officers reporting to Bessel. (Doc. 218 at 9 (noting that the two oldest employees, including Starling, were 67).) To be sure, Starling admits that no defendant ever made any explicitly ageist remark to him. (Doc. 219, Ex. A at 155:23-157:24.) Bessel also says she did not know Starling's age until his attorneys sent the June 17, 2015 letter "claiming that he was being discriminated against because of his age." (Doc. 219, Ex. B at ¶ 32.) Nunley, too, claims she did not know "Starling's age prior to his termination." (Doc. 219, Ex. D at ¶ 12.) Yet Bessel and Nunley's statements do not hold as a matter of law: "[O]n-the-job contact is sufficient to warrant an inference of an employer's knowledge of age," especially when viewing the facts in the light most favorable to the plaintiff on summary judgment. *Diaz v. Eagle Produce Ltd. P'Ship*, 523 F.3d 1201, 1210 (9th Cir. 2008) (citing *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69. 80 (2d Cir. 2005)).

Bessel and Nunley further acknowledge that they more than once asked Starling about succession planning. Such conversations are normally innocuous, but Starling points out that he made clear in March of 2014 he did not plan to retire for at least three to five years. Nevertheless, Bessel asked about his retirement plans again the following March, which is when Nunley became the new CEO. (Doc. 284 at 4.) As a matter of course, this was fine. But Starling's June 8, 2015 conversation with Bessel and Nunley was serious enough to prompt him to file an internal discrimination complaint and to retain counsel. According to Starling, the two were aggressive and threatening "and invited him to find another job." (Doc. 284 at 16.) Unbeknownst to Starling, various Banner executives were, at this time, discussing a "soft landing" package for him, despite his stated plans not to retire. (Doc. 267, Ex. 34.) They did not present the package, whatever it was, once Starling filed his internal discrimination complaint. Considered in total, these circumstances are enough to satisfy the lenient standard on summary judgment.

As emphasized above, the standard of proof is very low at this stage, particularly for summary judgment. Because he has made a *prima facie* case, the burden shifts to Banner to provide a nondiscriminatory basis for Starling's termination.

### 2. Banner's Proffered Nondiscriminatory Rationale

Banner fired Starling for allegedly failing to comply with its Employee Drug and Alcohol Testing Policy. Both parties agree that this suffices as a nondiscriminatory basis for his termination. The burden shifts back to Starling to demonstrate that this basis was a pretext.

### 3. Starling's Argument for Pretext

"[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000).

Banner's Employee Drug and Alcohol Testing Policy allows for drug/alcohol testing "[w]hen a manager and or supervisor has reasonable suspicion/just cause to suspect an employee of being impaired during work hours." (Doc. 219, Ex. B at Ex. D at 1.) It is unclear whether the holiday party counted as "work hours" for Starling. Starling never signed up for a shift and attended of his own accord. Further, the email subject for the reminder email was "FINAL *REQUEST* - HOLIDAY MEAL SERVING." (Doc. 267, Ex. 1 at Ex. 3 at 1 (emphasis added).) Starling had not attended in prior years and had never been disciplined for failing to do so. Helmich, the Chief Nursing Officer, never checked to make sure that the nursing directors who served under her signed up for shifts or showed up to serve food. (Doc. 267, Ex. 3 at 150:10-23.) Davis-Hill could not say whether she, as a C-Suite member, was *required* to work at the holiday party—only that it was "expected" of her. (Doc. 267, Ex. 4 at 68:1-22.)

Starling acknowledges that part of his job was to boost morale among the Hospital's staff and that being at the holiday party was one way to do that. (*See* Doc.

267, Ex. 1 at 44.)  Yet if that counts as "work hours," surely so do the Hospital events where alcohol was actually served.  After all, those were designed to advance similarly abstract Hospital goals, such as boosting morale or recognizing achievement.

Nor is it clear, given the conflicting reports of Starling's behavior at the party, that Starling was "impaired" or that it was reasonable to suspect that he was.  Even assuming he appeared to be, a reasonable juror could find that he was simply tired (he had been up since 5:00 am) or that he was in a festive mood.  Starling swears under penalty of perjury and based on personal knowledge that the accounts of his behavior at the party are false. That creates a genuine dispute.

Whether Starling was working or impaired are both open questions.  A reasonable juror could find that Banner's Alcohol Policy was arbitrarily enforced against one of Banner's oldest executive employees—and, therefore, that it was a pretext.  The Court will deny summary judgment on the ADEA termination claim.

### B.    Counts II, VI, and X (Banner): Violation of ADEA – Retaliation

The ADEA contains an anti-retaliation provision.  *See* 29 U.S.C. § 623(d).  The provision "makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding under the ADEA."  *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996).  "To make out a [*prima facie*] claim of retaliation, an employee must establish three things: first, that he engaged in statutorily protected activity; second, that he was discharged or suffered some other adverse employment decision; and third, that there is a causal connection between the two."  *Id*.  "[T]he causation element . . . requires the plaintiff to show by a preponderance [*sic*] of the evidence that engaging in the protected activity was one of the reasons for the firing and that but for such activity the plaintiff would not have been fired."  *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 785 (9th Cir. 1982) (internal quotation marks omitted).  If the employee makes the *prima facie* case, the *McDonnell Douglas* burden-shifting framework applies.

Internal complaints of harassment are a statutorily protected activity under Title VII. *See Villiarimo*, 281 F.3d 1054, 1064 (9th Cir. 2002). This reasoning extends to ADEA cases. *Cf. Wallis*, 26 F.3d at 888-89 ("We combine the Title VII and ADEA claims for analysis because the burdens of proof and persuasion are the same.").

Starling believes that Banner retaliated against him for his internal complaints of discrimination and his notice of intent to sue. He alleges that three of Banner's acts were retaliation: (1) the termination; (2) the performance improvement plan; and (3) the letter Bessel sent to the Medical Board. Starling's complaints are a protected activity under *Villiarimo*. The issues, then, turn on the adverse-employment-action and causation elements.

### 1.    Count II: Termination of Employment

Termination is plainly an adverse employment action. Thus, Starling must prove causation. He must show that but for his discrimination complaint, Banner would not have terminated his employment.

"[I]n some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo*, 281 F.3d at 1065. "[E]vidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000). The Ninth Circuit has held that being laid off within 59 days of filing an EEOC complaint is sufficient to establish a *prima facie* case of causation. *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505 (9th Cir. 1989).

Defendants focus exclusively on Starling's first internal complaint, which he made in June. The gap between that complaint and his termination would be too long to support a causation inference. *See Villiarimo*, 281 F.3d at 1065 (citing *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398-99 (7th Cir. 1999)). Yet Starling also complained in November and December. His lawyers sent notice of intent to sue on or around November 10, 2015. (Doc. 267, Ex. 26.) Starling points out that Banner decided to test

him for the first time a month after he gave notice of his intent to sue—even though he had consumed wine at Banner-related events in the past. (Doc. 210 at ¶ 16.) Viewed in the light most favorable to Starling, Banner's decision to test and terminate Starling could have been the result of his later complaints and his announced intent to sue.

Starling has therefore met his *prima facie* case on Count II. The *McDonnell Douglas* burden-shifting analysis now applies. As explained above, Banner had a facially nondiscriminatory reason for firing Starling. But a reasonable juror could find that the reason was pretextual. In the retaliation context, such a juror could conclude that Starling's supervisors were irritated that he was asserting his rights under the ADEA—forcing the company to investigate and defend against his allegations. Whether those allegations were true is a question for the jury, as is whether Banner arbitrarily enforced its Alcohol Policy against a complaining employee. Therefore, the Court will deny summary judgment on Count II.

### 2. Count VI: Performance Improvement Plan

First, the PIP was not an adverse employment action. As discussed (and was crucial to the ADEA termination holding) above, it was non-disciplinary and spelled out the manner in which Banner expected Starling to improve. Also, it did not explicitly form the basis for any adverse employment action. *See James v. C-Tran*, 130 Fed. Appx. 156, 157 (9th Cir. 2005). The PIP itself had no effect other than to point out areas on which Banner expected Starling to improve. Such a course of action is perfectly reasonable for any employer. Although Starling denies having received it, he had been placed on a PIP several years before the one in question (when Robertson was CEO) and had, according to Defendants, made enough progress to end it.

Starling argues that Banner penalized him by withdrawing its secret "soft landing" plan and placing him on the PIP. Starling's argument is akin to saying that Banner retaliated against him by not terminating his employment. This contention makes little sense.

Further, Starling must also prove causation. He must show that but for his discrimination complaint, Banner would not have placed him on the PIP. But Bessel discussed the PIP with Starling on June 8, 2015—*before* any of Starling's complaints. Thus, it is illogical to assert that any of his complaints caused the PIP. Count VI fails as a matter of law.

### 3.  Count X: Complaint to the Arizona Medical Board

Starling must show that but for his discrimination complaint(s), Bessel would not have sent the letter to the Medical Board. Toward that end, Starling argues only that the timing of the report to the Board suggests that his complaints caused Bessel (and Banner by extension) to send the letter. Yet unlike Starling's termination, it makes no sense to infer anything based on the timing of the letter. A.R.S. § 32-1451(A) requires health care institutions to report, in good faith, any basis they have to believe a physician is unable to engage safely in the practice of medicine. Banner's statutory obligation to report Starling would have arisen as soon as it was aware of that duty. Even if Banner did discriminate in administering the test and in firing Starling, given the positive test results, its statutory duty to report him would have immediately applied. In the defamation discussion below, the Court explains that Starling has failed to prove that Banner acted in bad faith in sending the letter. Therefore, summary judgment will be granted on Count X.

### C.  Count III (Banner): Violation of ADA – Disability Discrimination – Termination of Employment

A *prima facie* case under the Americans with Disabilities Act ("ADA") requires the plaintiff to demonstrate that: "(1) he is disabled within the meaning of the ADA; (2) he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) he suffered an adverse employment action because of his disability." *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003). 42 U.S.C. § 12102(3)(A) says that an individual is "regarded as" being disabled if he establishes that he "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is

perceived to limit a major life activity." If the plaintiff establishes his *prima facie* case, the *McDonnell Douglas* burden-shifting analysis applies.

Starling contends that Banner violated the ADA by terminating him when it regarded him "as having a physical or mental impairment." (Doc. 210 at ¶ 241.) He does not claim to be an alcoholic or to have requested an accommodation. His only proof that Banner regarded him as an alcoholic is Bessel's letter to the Medical Board. On its face, the letter states only the exact facts as Banner received them; it recounts the events of the holiday party. Yet there is a subtext: a concern that Starling's behavior rendered him unfit to practice medicine. After all, the letter begins by announcing the duty to report on "any information that appears to show that a physician is or may be unable to engage safely in the practice of medicine." (Doc. 267, Ex. 5 at Ex. 10.) Starling points out the "conundrum" the letter presents: either Bessel had reason to believe, at least in some way, that Starling had a substance abuse issue that rendered him unable to engage in the practice of medicine, or she lied to the Board. (Doc. 284 at 17.)

But Starling has not demonstrated that he was terminated as a pretext for his perceived disability of alcoholism. There is enough evidence in the record for a reasonable juror to conclude that *age* played a role in his firing. But there is no evidence at all that Banner was aware of Starling's supposed alcoholism prior to the holiday party or that it wanted him fired for it. Starling thinks the letter alone is enough to demonstrate that he was regarded as an alcoholic. Allowing such a threadbare case to proceed at the summary judgment stage would discourage physicians' employers from ever reporting them after even an isolated incident. For these reasons, and those discussed in the defamation analysis below, Starling's claim must fail on Count III.

### D. Count IV (Banner, Bessel, and Nunley): Violation of AEPA – Retaliation – Termination of Employment

The Arizona Employment Protection Act ("AEPA") prohibits retaliatory termination in certain circumstances. A plaintiff must show that: "(1) [he] had information or a reasonable belief that [his] employer or another employee had violated an Arizona statute or constitutional provision; (2) [he] disclosed the information or belief

to an employer or a representative of the employer whom [he] reasonably believed was in a managerial or supervisory position and had the authority to investigate the information and take action to prevent further violations of the Arizona constitution or statutes; and (3) [he] was terminated because of the first two steps." *Revit v. First Advantage Tax Consulting Servs., LLC*, 2012 WL 1230841, at *2 (D. Ariz. April 12, 2012) (citing A.R.S. § 23-1501(3)(c)).

Starling's complaint alleges that he "opposed decisions by Banner Health executive that he believed . . . would substantially harm patient care in violation of [A.R.S.] § 36-405 and the accompanying rules . . . ." (*Id.* at ¶ 254.)[1] In other words, Banner retaliated against him because he advocated for better patient care. Starling bases this peculiar claim on the conflict he had with Chatham over credentialing standards and "Chatham's attempts to negligently credential his son." (Doc. 210 at ¶ 252.) The idea seems to be that that Chatham accused him of being biased and that this poisoned Nunley against him. (*See* Doc. 267, Ex. 2 at ¶¶ 216-18.) In that light, Starling suggests that the "soft landing" package—which never came to fruition—was based in part on Chatham's accusations. (Doc. 284 at 18.)

There is no evidence to support this theory. Banner ultimately agreed with Starling's position and did not lower the credentialing standards. (Doc. 267 at ¶ 76.) Starling brought a potential problem to Banner's attention, and in the end Banner sided with him. There is no evidence this played any significant role—or any role at all—in his termination. Even viewed in the light most favorable to Starling, this claim must fail.

### E. Count V (Banner, Bessel, and Nunley): Violation of AEPA – Retaliation – Termination of Employment

Starling alleges that Banner violated another section of AEPA: A.R.S. § 23-1501(A)(3)(b). That portion supplies a cause of action when "[t]he employer has terminated the employment relationship of an employee in violation of a statute of this

---

[1] A.R.S. § 36-405 deals with the duties of the Director of the Department of Health Services. The Court assumes without deciding that the statute has at least some relevance to Starling's claim.

state." The provision further provides that where a statute provides a remedy, that remedy is exclusive.

Starling points to no state statute that his termination violated. Instead, he separately argues that Banner violated Article 18, Section 6 of the Arizona Constitution, which says, "The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation . . . ." He contends that he was terminated for pursuing his age discrimination lawsuit.

The Arizona Supreme Court has explained that Article 18, Section 6 was designed to "preserv[e] the ability to invoke judicial remedies for those wrongs traditionally recognized at common law." *Boswell v. Phx. Newspapers, Inc.*, 152 Ariz. 9, 17, 730 P.2d 186, 195 (1986). Starling cannot point to a common law action that the Legislature has abrogated in violation of Article 18, Section 6, and the constitutional provision does not itself supply a cause of action or remedy. Instead, Starling looks to two Ohio cases interpreting completely different language in a completely different state's constitution. (Doc. 284 at 18.) That strategy is wholly unpersuasive.

As noted above, a separate section of the AEPA contemplates both the State Constitution and its statutes. Here, by *expressio unius*, the relevant portion was intended to target only statutory violations. With no Arizona statute to which Starling can cite, summary judgment is appropriate on Count V.

F.    **Count IX (Banner, Bessel, Nunley, Davis-Hill, and Helmich): Invasion of Privacy – Intrusion Upon Seclusion**

Arizona courts have adopted the Restatement (Second) of Torts to define the tort of intrusion upon seclusion. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Hart v. Seven Resorts, Inc.*, 190 Ariz. 272, 279, 947 P.2d 846, 853 (Ct. App. 1997) (quoting Restatement (Second) of Torts § 652B). The comments to the Restatement, which the *Hart* court found controlling, make clear that the plaintiff must have intentionally secluded himself in a private place, such as his home. A

defendant is liable if he forces himself into the home; uses aids, such as wiretaps or binoculars, to invade the plaintiff's privacy; or rifles through the plaintiff's personal and confidential documents. *Id*. (quoting Restatement (Second) of Torts § 652B, cmts. b-c).

In *Hart*, the plaintiffs were employees subject to drug testing at any time. *Id.* at 274-75, 848-49. They were required to get into a van and taken off site for drug testing. *Id.* at 257, 849. As the court put it, the plaintiffs "fail[ed] to explain how [their employer's] demand that they take a drug test was an invasion of their seclusion, and instead [ ] merely enumerate the inconveniences they experienced. [Their] 'evidence' clearly does not even approach establishing the tort set forth by the Restatement." *Id.* at 279-80, 853-54. In another case, the Arizona Court of Appeals cited approvingly a case from Colorado in which unauthorized testing, performed on a blood sample taken for another purpose, was sufficient to state a claim for intrusion upon seclusion. *Havasupai Tribe of Havasupai Reservation v. Ariz. Bd. of Regents*, 220 Ariz. 214, 227, 204 P.3d 1063, 1076 (Ct. App. 2008) (citing *Doe v. High-Tech Institute*, 972 P.2d 1060, 1064 (Colo. App. 1998)). That appears to be the extent of the published case law on the tort in Arizona.

Starling alleges that Defendants intruded upon his seclusion when they required him to undergo the drug and alcohol testing. (Doc. 210 at ¶¶ 305-08.) As Defendants point out, Starling was on Banner property when he was tested. Starling counters by arguing that "[b]y testing [ ] Starling without cause while on his own personal time, Defendants intruded on his privacy." (Doc. 284 at 19.)

Unlike as in *Hart*, it is ambiguous whether Starling was working. By statute employers who establish a policy of drug or alcohol testing are immune from liability if they have a "good faith belief that an employee had an impairment while working while on the employer's premises or during hours of employment." A.R.S. § 23-493.06(A)(6). It may well be that a good faith belief that Starling was on duty suffices for this defense. But the Court need not decide this because the claim fails before even reaching this defense.

Irrespective of whether Starling was working, Banner did not intrude upon his seclusion.  He voluntarily entered Banner's premises.  He was free to leave, and the testing procedure, a simple breathalyzer and urine sample, was not "highly offensive to a reasonable person."  The reasons for the test were known to Starling; Defendants did not lie about those reasons.  He was willing to take the breathalyzer twice and to provide a urine sample, which was obtained in private.  Count IX fails as a matter of law.

### G. Counts VII and VIII (Banner, Bessel, and Nunley): Defamation – False Statements Regarding Job Performance

Starling does not defend these claims.  He complains that he has been hindered in gathering evidence.  (*See* Doc. 284 at 18.)  He also points to his Controverting Statement of Facts, an impermissible place to make a legal argument.  The Court considers the claims abandoned, especially in light of its ruling below on Starling's Rule 56(d) motion.

### H. Count XI (Banner and Bessel): Defamation – False Statements in Complaint to the Arizona Medical Board

Starling alleges that Bessel and Banner defamed him by sending Bessel's letter to the Medical Board.

#### 1. Defamation Generally

"One who publishes a false and defamatory communication concerning a private person . . . is subject to liability, if, but only if, he (a) knows that the statement is false and it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them."  *Rowland v. Union Hills Country Club*, 157 Ariz. 301, 306, 757 P.2d 105, 111 (Ct. App. 1988) (quoting Restatement (Second) of Torts § 580(B)) (emphasis removed).  "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation."  *Godbehere v. Phx. Newspapers, Inc.*, 162 Ariz. 335, 341, 783 P.2d 781, 787 (1989).

#### 2. The Duty to Report and Qualified Privilege

The Arizona State Board of Medical Examiners regulates the practice of medicine in Arizona.  A.R.S. § 32-1451(A) requires medical doctors and health care institutions to

"report to the [Board] any information that appears to show that a doctor of medicine is or may be medically incompetent, is or may be guilty of unprofessional conduct[,] or is or may be mentally or physically unable to safely engage in the practice of medicine." The statute further provides, "Any person or entity that reports or provides information to the [Board] in good faith is not subject to an action for civil damages." *Id.* In fact, "[i]t is an act of unprofessional conduct for any doctor of medicine to fail to report as required" by the statute. *Id.*

Yet there is no absolute privilege in reporting. The statute, with its emphasis on good faith, "abrogate[s] the common law absolute privilege in the context of reports involving medical malfeasance." *Advanced Cardiac Specialists, Chartered v. Tri-City Cardiology Consultants, P.C.*, 222 Ariz. 383, 386, 214 P.3d 1024, 1027 (Ct. App. 2009). Arizona law instead provides a qualified privilege to defendants in these cases. "To avoid summary judgment pursuant to the qualified privilege that protects such reports, plaintiffs must produce clear and convincing evidence" that the reporting party abused the privilege. *Id.* at 387, 1028. "[T]he plaintiff may [ ] prove an abuse of [the] privilege either by proving publication with 'actual malice' or by demonstrating excessive publication." *Green Acres Trust v. London*, 141 Ariz. 609, 616, 688 P.2d 617, 624 (1984). "An abuse through 'actual malice' occurs when the defendant makes a statement knowing its falsity or actually entertaining doubts about its truth." *Id.* "Abuse through excessive publication results from publication to an unprivileged recipient not reasonably necessary to protect the interest upon which the privilege is grounded." *Id.* The burden is on the plaintiff to prove that the defendant abused the privilege—in this case, "actually entertain[ing] serious doubt about the truth of [the] statement" or knowing it is probably false. *Advanced Cardiac*, 222 Ariz. at 388, 214 P.3d at 1029.

### 3.   Bessel's Letter to the Board

"Substantial truth is a complete defense to an action for defamation." *Morris v. Warner*, 160 Ariz. 55, 63, 770 P.2d 359, 367 (Ct. App. 1988). Yet as the Ninth Circuit has explained, "Statements, although perhaps 'true' when viewed in isolation, may create

an overall false impression when considered in context." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 984 (9th Cir. 2002).

Under Arizona law, Starling bears the burden of proving by clear and convincing evidence that Bessel abused her qualified privilege—i.e., that she acted with actual malice or published the statement excessively. The private letter to the Board was not excessive publication. Thus, a reasonable juror must be able to find clear and convincing evidence that Bessel actually entertained serious doubts about the truth of her letter or knew it was, on the whole, probably false.

All Bessel did was report on exactly what happened at the events of the holiday party, as she may have been legally obligated to do. Her letter refers to A.R.S. § 32-1451(A) and Banner's duty "to report to the Board any information that appears to show that a physician is or may be unable to engage safely in the practice of medicine." (Doc. 267, Ex. 5 at Ex. 10.) The letter draws no conclusions from the bare clinical facts recited. Everything Bessel reported to the Board was true.

Starling believes that Bessel impliedly accused him of being an alcoholic in her report to the Board. (Doc. 219, Ex. A at 414:18-415:5.) He asserts that there was no basis to believe that he had a "substance abuse problem," which he admits would have required a report to the Board.

The reporting statute draws a fine line. It is professional misconduct for a doctor or hospital to fail to report incompetent physicians, but the reporting party still must have a good-faith basis for the report. Under *Advanced Cardiac*, the employer gets the benefit of any doubt. Consider a different case, where it is undisputed that the physician was inebriated—but only once—while performing surgery. An employer in such a case might be unwilling to report that physician, even after firing him, if Arizona law exposed employers to potential liability for reporting solitary cases. Such policy would plainly be unwise and has no basis in either the reporting statute or the Arizona courts' qualified-privilege jurisprudence. The fact that Bessel's was a report based on a single, factually

1  correct incident is a matter for the Medical Board to consider—which it did, dismissing

2  the case against Starling.  Count XI must fail.

3  **IV.    STARLING'S RULE 56(D) MOTION**

4        Federal Rule of Civil Procedure 56(d) provides as follows: "If a nonmovant shows

5  by affidavit or declaration that, for specified reasons, it cannot present facts essential to

6  justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow

7  time to obtain affidavits or declarations or to take discovery; or (3) issue any other

8  appropriate order."

9        Starling's motion rehashes the following discovery arguments that the Court has

10  already addressed and ruled on.

11       **A.    Comparator Discovery**

12       Starling argues that the Court was too restrictive in "limiting [comparator

13  discovery] to the two decision-makers," Bessel and Nunley.  (Doc. 243 at 13.)  He cites

14  *Hawn v. Executive Jet Management, Inc.*, 615 F.3d 1151 (9th Cir. 2010), for the

15  proposition that it is error to impose a strict "same supervisor" requirement.  *Id.* at 1157.

16  What the *Hawn* court actually found was as follows: "Similarity between two persons or

17  groups of people is a question of fact that cannot be mechanically resolved by

18  determining whether they had the same supervisor without attention to the underlying

19  issues."  *Id.* at 1158.  Further, the court did "not exclude the possibility that the presence

20  or absence of a shared supervisor might be relevant in some cases."  *Id.* at 1157.  Here,

21  the Court gave attention to the underlying issues, as *Hawn* requires.  Starling seeks

22  discovery on the entire company, when an employee similarly situated to Starling would

23  have to be an executive physician in a position to effect change in company policy.  The

24  Court allowed comparator discovery concerning the supervisors of such employees.

25  (Doc. 171.)

26       Starling also points to *Garrett v. City & County of San Francisco*, 818 F.2d 1515

27  (9th Cir. 1987), a case in which the court actually made clear that "a trial court's exercise

28  of discretion will rarely be disturbed."  *Id.* at 1518.  But in that case, the district court

failed to exercise *any* discretion; it denied the motion as moot after having granted summary judgment. *Id*. Further, the information the plaintiff sought in that case was not overly broad. *See id.* at 1518-19. In this case, the Court specifically exercised its discretion in finding that the comparators plaintiffs sought were "wildly over-broad and burdensome." (Doc. 171 at 1.)

Starling claims that the discovery he seeks is "essential to opposing summary judgment." (Doc. 243 at 13.) Apparently not, since he prevailed on the age discrimination issue. The Court stands by what it said when Starling last complained about the lack of comparator discovery: "Defendants have complied literally with the limited discovery ordered. Moreover, extrapolation to matters about which the people in question had only peripheral information is the kind of sweeping, burdensome, and attenuated discovery the Court found improper." (Doc. 294 at 1.)

### B. Depositions of Decision-Makers

Starling argues that discovery should reopen because he did not get to depose Bessel or Nunley. Starling once again cites *Noyes v. Kelly Services*, 488 F.3d 1163 (9th Cir. 2007), contending that the Ninth Circuit has found that a plaintiff is diligent any time he notices a deposition prior to the cutoff of discovery. (Doc. 285 at 5.) In reality, the *Noyes* court found it an abuse of discretion not to modify a scheduling order when there were no unusual circumstances and the defendant had repeatedly requested to delay the deposition. 488 F.3d at 1174. "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment" of a scheduling order. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

In this case, there were plenty of unusual circumstances and a complete lack of diligence from Starling. Following a July 29, 2016 Scheduling Conference, the Court set a discovery deadline of May 26, 2017. (Doc. 45 at 2.) The Court subsequently granted, after lengthy oral argument, Defendants' Motion for Protective Order (Doc. 158) to prevent Starling's late-noticed depositions. It found that Starling failed "for nearly ten months to schedule the depositions of the Banner defendants, who are physicians or

senior managers, despite repeated requests to do so." (Doc. 224 at 1.) Yet "[o]n the eve of the discovery cutoff, [Starling] unilaterally noticed the deposition." (*Id*.) He did not notify opposing counsel, and the witnesses were unavailable. This case is not at all like *Noyes*: Starling was not diligent, despite Banner's outreach. So egregious was the unprofessionalism that the Court assessed fees under Rule 37(a)(5)(A)(ii). (Doc. 224 at 2.)

### C.    Waiver of Privilege

Starling seeks discovery on various documents that Defendants claim are privileged. Starling's Reply does not even attempt to defend this issue, other than to note he is preserving it for appeal purposes. (Doc. 285 at 3.) Defendants point out that, in an order following oral argument (Doc. 193), the Court rejected Starling's privilege arguments. Starling conceded this point in his motion (Doc. 243 at 10), and he offers no reason whatsoever to revisit the Court's holding. (*See* Doc. 243 at 16.)

### V.    CONCLUSION

No claims remain against Bessel, Nunley, Helmich, or Davis-Hill. Only Starling's ADEA age discrimination and ADEA retaliatory discrimination case against Banner will proceed. A final pretrial conference will be set by separate order.

IT IS THEREFORE ORDERED that Defendants Banner Health, Marjorie Bessel, M.D., Julie Nunley, Cindy Helmich, and Lori Davis-Hill's Motion for Summary Judgment (Doc. 218) is granted regarding Counts III, IV, V, VI, VII, VIII, IX, X, and XI and denied regarding Counts I and II.

IT IS FURTHER ORDERED that Plaintiff's Motion Pursuant to Federal Rule of Civil Procedure 56(d) (Doc. 243) is denied.

Dated this 11th day of January, 2018.

_____
Neil V. Wake
Senior United States District Judge