**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Starling, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>Banner Health, an Arizona corporation,<br><br>Defendant. | No. CV-16-00708-PHX-NVW<br><br>**ORDER** |

Before the Court are Defendant's two motions challenging Plaintiff's expert witnesses, the Responses, and the Replies. First is Defendant's Motion to Exclude Testimony of Stan Smith (Doc. 216). Second is Defendant's Motion to Exclude Testimony of Chester Flaxmayer (Doc. 221). The first motion will be granted in part and denied in part. The second will be granted.

**I.   STANDARD FOR ADMISSION OF EXPERT TESTIMONY**

Rule 702 of the Federal Rules of Evidence governs admission of opinion testimony from qualified experts. Testimony is admissible if (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Where the basis for an expert's testimony has been "sufficiently called into question. . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)) (citation omitted). The Court must "decide whether this particular expert [has] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Id.* at 156 (internal quotation marks omitted).

## II. STAN SMITH

Dr. Stan Smith ("Smith") is an economist with impressive credentials, including a Ph.D. in Economics from the University of Chicago, where his doctoral advisor was Nobel Prize winner Gary Becker. (Doc. 230-1, Ex. 1 at Ex. C at 51 of 85.) Starling wishes to present Smith's opinion on Starling's (1) hedonic damages and (2) lost wages and benefits.

### A. Hedonic Damages

Smith believes that the value of a statistical human life is $4.6 million. He arrived at this figure through a "willingness-to-pay" model. (*See* Doc. 216-1, Ex. B at 29-30 of 50. ("My estimate of the value of life is based on many economic studies on what we, as a contemporary society, actually pay to preserve the ability to lead a normal life.").) The basic idea is to "measure[ ] the monetary worth of life by calculating the amounts that individuals, government agencies, and businesses are willing to pay for reductions in health and safety risks." *Smith v. Jenkins*, 732 F.3d 51, 65 (1st Cir. 2013). Here, Smith examined five economic meta-analyses "and the values of a statistical life that they recommend." (Doc. 216-1, Ex. B at 37 of 50.) He found "a credible net value of life based on all these literature reviews to be . . . $5.4 million in 2008 dollars." (*Id*.) He then calculated the actual value of a statistical life to be "$4.1 million in year 2008 dollars ($4.6 million in year 2016 dollars)[, which] is approximately 24 percent lower than a conservative average estimate based on the [ ] meta-analyses." (*Id*.) When asked why he lowered the amount by roughly 25 percent, as opposed to 20 percent or 15, he explained

that the number was essentially arbitrary. (*See* Doc. 216-1, Ex. A at 151:20-152:19.) Smith noted that it is his standard practice "to make conservative judgments when approaching [ ] matters that don't have a high degree of specificity. So if someone wants to see these studies and say let's take a conservative view of their results, by taking off 25 percent, that's a conservative view." (*Id.* at 153:2-7.) Finally, applying Starling's self-assessment that he had experienced a one-half reduction in enjoyment of life, Smith calculated the present value of each year of lost reputation until age 84. (*Id.* at 163:18-164:13; Doc. 216-1, Ex. B at 29, 50 of 50.) Age 84 is, according to Smith, a statistical figure provided by the Centers for Disease Control—"the age to which [Starling] has a 50/50 chance of living past" or 50/50 chance of not. (Doc. 216-1, Ex. A at 244:22-245:4.)

### 1. Smith's analysis would not help the jury.

According to the First Circuit, "The overwhelming majority of courts have concluded that [Smith's] 'willingness-to-pay' methodology is either unreliable or not likely to assist the jury in valuing hedonic damages, or both." *Smith*, 732 F.3d at 66 (collecting cases).

The fundamental problem with Smith's testimony is that it is unlikely to help the jury. Smith "equate[s] the value of life with the value of *enjoyment* of life, though it is readily apparent that the two are not the same. A plaintiff who loses enjoyment of life but is alive is not in the same shoes as a plaintiff who lost his life." *Id.* at 66 (emphasis added). Consider a real case, in which a wife died and a husband lived on without her companionship. Under Smith's "analysis their damages [were] identical, save only an adjustment for differing the expectancy." *Sullivan v. U.S. Gypsum Co.*, 862 F. Supp. 317, 321 (D. Kan. 1994). Smith's proffered testimony "simply fail[ed] in any real terms to provide a measure of the loss and affection" the husband experienced. *Id.* In starker terms, it was implausible that "the distinct and personal relationship that [the husband] enjoyed with his wife ha[d] commercial value [that could] be determined by a comparison to the alleged value that society places on the contributions of a statistically

average person." *Id.* *See also Castrillon v. St. Vincent Hosp. & Health Care Center, Inc.*, No. 1:11-cv-430-WTL-DML, 2015 WL 3448947, at *2 (S.D. Ind. May 29, 2015) ("In order to be useful to the jury, Dr. Smith would have had to start with the value of the *enjoyment* of the Plaintiff's life but-for the events at issue in this case and then reduce *that figure* by the percentage of enjoyment she has lost.").

Smith's base figure of $4.6 million is supposed to apply to any given human being. The figure, by its very nature, is unmoored from anything individualized to Starling. Observe its failure, in the loss-of-enjoyment context, to meaningfully compare "(1) a person who is sick with one who is healthy or (2) someone very old with someone very young. Or [ ] (3) a person with a loving family with one who has none, or (4) someone with many friends versus someone who has none." *Ayers v. Robinson*, 887 F. Supp. 1049, 1061 (N.D. Ill. 1995). "Try it with an arguably tougher class of criteria—say (5) wealth, (6) race, (7) intelligence, (8) education, (9) sex, (10) character, (11) reputation—and the complexities become plain." *Id.* at 1061-62. The jury is to determine *Starling*'s loss-of-enjoyment damages, which Smith's figure does not help it to do.

Members of the jury are perfectly capable of drawing on their experiences and knowledge and on Starling's testimony to determine any loss of enjoyment of life that he suffered as a result of his termination.[1] Starling's self-assessed one-half diminution in quality of life is something he can attempt to convince the jury of. What matters is how much Starling *enjoyed* his life prior to this incident and what that translates into in monetary terms. Smith's analysis does not provide that information, and the jury is capable of discerning it without Smith's help. *See Saia v. Sears Roebuck & Co., Inc.*, 47

---

[1] Smith stated that the "purpose of calculating hedonic damages in this case was to place a monetary value on [Starling's] lost reputation from his termination of employment and *the complaint Defendants submitted to the Arizona Medical Board*." (Doc. 230-1, Ex. 1 at ¶ 17 (emphasis added).) In its Summary Judgment Order, the Court dismissed each of Starling's claims resulting from the complaint to the Medical Board. To the extent any part of Starling's one-half diminution was based on the letter, Smith would have to recalculate in accordance with the Court's Order even if the Court were to allow his testimony.

- 4 -

F. Supp. 2d 141, 150 (D. Mass 1999) ("At bottom, the court believes that the qualitative and quantitative value of the loss of [plaintiff's] enjoyment of life, as it might be included in the pain and suffering he may have endured, can be calculated independently by the jury without the assistance, if not the confusion, of Dr. Smith's proffered testimony.").

### 2. Smith's methodology is flawed as applied to hedonic damages.

Various courts, including the Ninth Circuit, have also expressed skepticism toward Smith's methodology itself. *See Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1195 (9th Cir. 2005) (dictum). Although Smith's bottom-line dollar figure "gives some finitude to a question that can sound like a probe into the infinite," its usefulness is questionable "because he averaged this figure with other estimates, likely to be much higher, and not at all informative about how much people value their own enjoyment of life." *Id*. "That a government safety program costs a certain amount per life saved, or that the government requires purchase of a certain kind of safety equipment, may suggest a collective policy judgment the government has made, or may represent a policy selected for reasons other than the cost-benefit analysis 'hedonic analysis' implies, or even a mistaken policy." *Id*. Similarly, the Seventh Circuit has expressed "serious doubts about [Smith's] assertion that the studies he relies upon actually measure how much Americans value life." *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992). "[H]umans are moved by more than monetary incentives." *Id*. To consider how many variables are potentially unexplored, consider that

> government calculations about how much to spend (or force others to spend) on health and safety regulations are motivated by a host of considerations other than the value of life: [I]s it an election year? [H]ow large is the budget deficit? [O]n which constituents will the burden of the regulations fall? [W]hat influence and pressure have lobbyists brought to bear? [W]hat is the view of interested constituents? And so on.

*Id.*

Moreover, the arbitrariness of the "conservative" 25 percent reduction is troubling. As before, Smith "provides no explanation or method for calculating the conservative

factor based on data or theories originating from economic research, leaving the Court with no option but to conclude that the conservative value is derived through unmethodical, subjective 'eyeballing.'" *Stokes v. John Deere Seeding Grp.*, No. 4:12-cv-04054-SLD-JAG, 2014 WL 675820, at *5 (C.D. Ill. Feb. 21, 2014) (quoting *Ayers*, 887 F. Supp. at 1060). Smith admits that he is conservative when approaching "matters that don't have a high degree of specificity." (Doc. 216-1, Ex. A at 153:2-4.) Although experts need not be certain, Smith does not point to anything justifying the manner in which he exercises this conservative discretion.

Starling points out that Banner did not offer a rebuttal expert opinion on Smith's methodology. The law does not require it to offer such a witness. Starling also posits, based on Smith's declaration, that Smith's "hedonic damages testimony has been allowed by approximately 224 state and federal courts around the country." (Doc. 230 at 12.) Yet Starling does not demonstrate that any of those courts discussed or considered the cases discussed above and in Banner's briefing. He does not describe Smith's role in those 224 cases or the testimony that Smith gave.

Ultimately, the Ninth Circuit was clear that the "admissibility of testimony such as that given by Smith concerning hedonic damages is committed to the district court's sound discretion." *Dorn*, 397 F.3d at 1195. The Court's discretion is abundant basis to exclude Smith's opinion testimony. Indeed, in the circumstances it would be an abuse of discretion to admit Smith's testimony. But the Court need not demonstrate that it may not do what it is already amply persuaded not to do. For the reasons above, and given the great weight of the persuasive authority, Smith's testimony regarding hedonic damages will be excluded.

### B. Lost Wages and Benefits

Starling's take-home income varied from year to year. In 2009, for example, he made $493,140, while in the next year, 2010, he made $605,027. 2011 was again quite different, as Starling collected $545,122. (Doc. 230-1, Ex. 1 at Ex. D at 84 of 85.) Smith needed to account for these variations in creating a baseline for Starling's lost wages. In

calculating that baseline, Smith adjusted previous years' income by the growth in the consumer price index through 2015. (*See id*.) Based on the average of Starling's actual income and benefits from 2009 through 2015 (all converted to 2015 dollars), Smith calculated a baseline salary of $572,808 in 2015 dollars. (Doc. 230-1, Ex. 1 at Ex. C at 54 of 85.)

Smith's calculations assume that Starling would have stayed in his current role at Banner (Chief Medical Officer) because Starling expressly stated he was not looking to be promoted. (Doc. 230-1, Ex. 1 at Ex. C at 54 of 85.) His report also notes that Starling "state[d] that he planned to continue working for at least 3 to 5 more years had he not been terminated." (*Id*.) From this information, Smith generated several tables. One, Table 3S, is intended to show Starling's economic loss to date. (*Id.* at 69 of 85.)[2] Another, Table 7S, is designed to show the present value of Starling's wages and benefits through 2032, the year when he would turn 84. (*Id.* at 73 of 85.) The 2016 and 2017 wages were "adjusted by an estimated inflationary growth of 2.00 percent," while "[f]uture wages are illustrated to grow at zero percent real." (*Id.* at 54 of 85.) With respect to benefits, Smith "assumed that [they] grow at the same rate as wages," and he "discounted [them] to present value at the same discount rate." (*Id*.) Finally, Smith's report assumes that "Starling has not mitigated, and will not mitigate, any of his damages for lost wages and employee benefits." (*Id.* at 55 of 85.)

### 1. Smith's report is not overly speculative with respect to wages and benefits.

Banner first complains that Smith does not opine on Starling's *actual* lost wages and benefits. Instead, as discussed, he provides a table (Table 7S) with different possible damages based on different years when Starling may have retired. The table goes until age 84 for reasons explained above. At age 84, Starling would have accrued, according to Smith, $9,403,059 in lost wages and benefits. (*Id.* at 73 of 85.) Banner further frets

---

[2] Smith calculated the loss assuming a November 15, 2017 trial date. (Doc. 230-1, Ex. 1 at Ex. C at 57 of 85.) Obviously that date has passed. Smith will need to recalculate accordingly.

- 7 -

1  that the "jury would be left to speculate because Dr. Smith does not adequately explain
2  how he calculated this range of potential lost wages." (Doc. 216 at 9.)

3  Banner's concerns are misplaced. With respect to back pay (shown in Table 3S),
4  Smith *has* opined on what Starling would have earned in the time from his termination to
5  the time leading up to trial. There is nothing unduly prejudicial or speculative in Table
6  3S.

7  Front pay (shown in Table 7S), on the other hand, is an equitable remedy. When
8  an employer-defendant is found liable, the court, not the jury, will decide whether
9  reinstatement or front pay is appropriate. "Courts [have] recognized that reinstatement
10 [is] not always a viable option, and that an award of front pay as a substitute for
11 reinstatement in such cases [is] a necessary part of the 'make whole' relief mandated by
12 Congress." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 850 (2001). "As a
13 practical matter, front pay is awarded at the court's discretion only if the court determines
14 that reinstatement is inappropriate, such as where no position is available or the
15 employer-employee relationship has been so damaged by animosity that reinstatement is
16 impracticable." *Traxler v. Multnomah Cty.*, 596 F.3d 1007, 1012 (9th Cir. 2010).

17 The Ninth Circuit has allowed, after the district court decided whether
18 reinstatement was appropriate, the parties to submit the front-pay damages question to the
19 jury. *See Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1346-48 (9th Cir. 1987).
20 (Note that there must be an appropriate mitigation instruction.) But as the *Traxler* court
21 explained, "A trial court, sitting in equity, may [ ] employ an advisory jury. The ultimate
22 decision, however, rests with the court." 596 F.3d at 1013. It also cast doubt on what it
23 described as dicta in *Cassino*, noting that "[n]early all of the circuits that have considered
24 front pay under the ADEA treat the remedy as wholly equitable, leaving both the
25 availability and amount of front pay to the court." *Id.* at 1014. Banner does not dispute
26 these principles. (*See* Doc. 263 at 5-6.)

27 Banner is correct that it would be unduly speculative to assert that Starling will
28 work until he is 84. But that is not what Starling has asserted. Instead, he said he wanted

to work another three to five years. At trial, Starling will need to show how many years he would have continued to work. If reinstatement is inappropriate, the Court can still use Smith's calculations and table as a guide. The Court is mindful of the duty to mitigate and that "front pay is intended to be temporary in nature. An award of front pay does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing." *Cassino*, 817 F.2d at 1347 (internal quotation marks omitted).

### 2. Smith's report does not violate Rule 26.

Banner also contends that "Dr. Smith's report does not identify various adjustments (inflationary or otherwise) that were made to Plaintiff's income in 2009 through 2015 to arrive at the critical $572,808 base wage rate that Dr. Smith used to create the range." (Doc. 263 at 7.) Banner claims this is "missing information." (*Id.*) In Smith's work notes, which were supplied to Banner, he shows how he calculated the base wage rate. (Doc. 230-1, Ex. 1 at Ex. D at 84 of 85.) Banner contends that this violates Rule 26 because the calculation does not appear in the report itself. *See* Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii) ("The *report* must contain[ ] a complete statement of all opinions the witness will express and the basis and reasons for them [and] the facts or data considered by the witness in forming them." (emphasis added)).

The purpose of Rule 26 is to eliminate "unfair surprise to the opposing party." *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995). The crucial issue is whether the opposing party is "prejudicially deprived of notice of the substance of [the expert's] testimony." *Lundquist v. United States*, No. 96-35219, 1997 WL 355933, at *1 (9th Cir. June 27, 1997) (citing *Sylla-Sawdown*, 47 F.3d at 284). Oft-quoted language from the 1993 Advisory Committee Notes explains that the Rule is designed to avoid "sketchy and vague" insights into the substance of the expert's testimony at trial.

Banner fails to explain how it was prejudiced by Smith's report, especially since the report was supplemented with Smith's work notes. Pointing to deposition testimony in which Smith said he did not prepare the report for non-economists, Banner suggests

1 that the Smith's report is readable only by economists. (*See* Doc. 216 at 10.) Yet the
2 Court was able to determine from Smith's work notes how he calculated the base wage.

3 Banner never contends that Smith used methods outside of established norms. It is
4 reasonable to assume that an economist bases a loss-of-income report on the general
5 standards of his profession. Banner's exchange with Smith at his deposition reveals that
6 he was intemperate and irritated, but it does not reveal that he did not follow the practices
7 economists would normally use to generate an average wage. (*See id.* at 9-10.) If Banner
8 takes issue with that calculation, and if Smith is unable to explain it well enough, it can
9 certainly forcefully raise the issue on cross-examination.

10 The lost wages component of Smith's report is comprehensive and complete. It is
11 helpful to the jury in determining Starling's back pay. It was prepared using Smith's
12 background and expertise. The Court will allow Smith to testify about the back pay
13 portions of the report in front of the jury.

### III. CHESTER FLAXMAYER

15 Chester Flaxmayer ("Flaxmayer") is a forensic toxicologist and criminalist. (Doc.
16 231-1, Ex. 1 at Ex. B at 30 of 39.) He has "over thirty years of practical experience in the
17 area of forensic breath and blood alcohol determinations and the measurement of drugs in
18 the human system as well as their effects." (*Id*.) Flaxmayer opines principally that six of
19 Starling's behaviors reported during the night of the holiday party "should not have
20 occurred due to his consumption of alcohol based on his BrAC [breath alcohol content]
21 that night." (*Id*.) "Additionally, certain of these behaviors are not behaviors that we
22 think of as being caused by alcohol consumption regardless of amount." (*Id*.)

23 Flaxmayer's testimony will be excluded because it is not relevant. Starling was
24 not terminated for being intoxicated at work. He was ostensibly terminated for exceeding
25 Banner's 0.02 BAC (blood alcohol content) limit. He indisputably did exceed it: he
26 tested at 0.043 at 2:30 a.m. Flaxmayer's own opinion is that Starling's BAC was
27 between 0.087 and 0.077 at 11:15 p.m. when Starling arrived at the party. But Banner
28 need not prove, and Starling need not disprove, that alcohol caused the observed

behaviors. Further, even if these opinions had some attenuated relevance, they plainly fail the Rule 403 balancing test for admissibility.

### A. Flaxmayer's Report and Proffered Testimony

Flaxmayer's report contains "a chart developed by Dr. [Kurt] Dubowski in which he summarizes years of peer reviewed research and studies examining the effects of alcohol on humans." (Doc. 231-1, Ex. 1 at ¶ 8.) Flaxmayer contends that his report "appropriately takes into account human variability" by showing different "ranges of alcohol concentration at which certain behaviors are exhibited by humans." (*Id.* at ¶ 9.)

Working backwards from the result of Starling's breathalyzer test, Flaxmayer performs a "retrograde extrapolation"[3] of Starling's BAC to establish what his maximum BAC would have been on the night of the holiday party. To perform such an extrapolation, he requires the following: (1) "documentation of the alcohol determination showing alcohol content at a particular time"; (2) "what alcohol the subject consumed at what times and in what amounts on the particular day"; (3) "the subject's history of food consumption on the particular day"; (4) "the subject's weight"; (5) "the subject's sex"; and (6) "the time in question." (*Id.* at ¶ 11.) He does not need, but can use, the person's alcohol consumption history—"e.g., heavy, moderate, or light drinker." (*Id.*) The consumption history can make the analysis more reliable. (*Id.* at ¶ 13.)

In performing the retrograde extrapolation, Flaxmayer considered the documentation from Starling's breathalyzer test, Starling's witness statement, Helmich's witness statement, Davis-Hill's witness statement, and *Garriott's Medicolegal Aspects of Alcohol* (Yale H. Caplan and Bruce A. Goldberger eds., 6th ed. Lawyers & Judges Pub. Co. 2015). (Doc. 231-1, Ex. 1 at Ex. B at 33-34 of 39.) According to Flaxmayer, "24 ounces of 13.9% v/v wine will give a 190 Lb. male a maximum BrAC of 0.1364 g ethanol/210 L breath," assuming that no elimination of alcohol occurs before a test is

---

[3] There is no need for this neologistic barbarism. "Extrapolation" means "finding by a calculation based on the known terms of a series, other terms outside of them, whether preceding or following." *Extrapolation*, Oxford English Dictionary (2d ed. 1991).

- 11 -

conducted. (*Id.* at 35 of 39.) Elimination of alcohol follows the breath alcohol peak, which happens roughly 50 to 180 minutes after consumption, depending on how much food and the type of foods an individual has in his stomach. (*Id.* at 35-36 of 39.) With respect to Starling's elimination rate, "[t]he described drinking history and breath alcohol measurements . . . [are] consistent with an elimination rate of approximately 0.012 grams ethanol/210 L breath for Dr. Starling on the night in question." (*Id.* at 37 of 39.) In Starling's case, roughly 195 minutes elapsed between his arrival at the holiday party and his breathalyzer test. (*Id.* at 36 of 39.) Based on the model of breathalyzer used and the elimination rate, Flaxmayer estimates that Starling's maximum BAC when he got to the hospital party was between 0.087 and 0.077. (*Id.*)

Flaxmayer then discusses several ways in which the accusations against Starling do not comport with the literature. Citing Dubowski, Flaxmayer notes the following behaviors occur within different BAC ranges: (1) "While in the range of .01 to .05 -- No apparent influence. Behavior nearly normal by ordinary observation. Slight changes detectable by special tests." (2) "While in the range of .03 to .12 -- Mild euphoria, sociability, talkativeness. Increased self-confidence; decreased inhibitions. Diminution of attention, judgment and control. Beginning sensory-motor impairment. Slowed information processing. Loss of efficiency in finer performance tasks." It is irrelevant to this case what typical behaviors are associated with higher BAC levels, but Flaxmayer describes behaviors and consequences, including death, associated with five more ranges of intoxication up to 0.50.

Flaxmayer postulates, given his retrograde extrapolation of Starling's BAC to its 0.087 maximum, that the following likely did not occur due to alcohol consumption: "(1) slurred speech; (2) stumbling or staggering; (3) flailing of hands and arms; (4) over-animated speech; (5) changes in cadence of his speech; and (6) losing his train of thought." (*Id.* at 30 of 39.) Flaxmayer claims Starling's BAC "should not have been high enough for alcohol to be the cause of those behaviors," and some of them are not even caused by alcohol consumption regardless of the amount. (*Id.*)

### B. Lack of Relevance and Failure of the Rule 403 Balancing Test

Flaxmayer does not deny that Starling exhibited the behaviors that others identified. He does say he does not expect *alcohol* to have been the cause of those behaviors. When deposed, Flaxmayer was asked, "You're not saying that Dr. Starling could not have been exhibiting this behavior on the 15th and the 16th; correct?" (Doc. 221-2, Ex. B at 72:24-73:1.) He responded, "I would agree. I'm just saying I wouldn't expect it, if he did exhibit it, to have been caused by the consumption of alcohol." (*Id.*at 73:2-4.) Such testimony is irrelevant. Starling never explains how this expert testimony is relevant; he just proclaims it so without explanation. The Court is not required to search for some unarticulated relevance that the proponent himself will not identify.

Starling and Flaxmayer do not and cannot dispute that Starling's BAC was 0.043 at 2:30 a.m. and was, by Flaxmayer's own calculation, between 0.087 and 0.077 at 11:15 p.m., when Starling arrived at the hospital party. They do not dispute that Starling's BAC when at the party was four times the Banner limit of 0.02. Flaxmayer's opinions would not change this fundamental fact. In the end, it is irrelevant what Flaxmayer would have expected or whether the Starling's observed behaviors were caused by alcohol or something else and were misunderstood by the observers. Flaxmayer constructs an elaborate chess game of premises, inferences, and strategies. But the blunt fact of Starling's BAC sweeps Flaxmayer's chess pieces off the table. That game is over—or it never began.

Finally, even if Flaxmayer's testimony were relevant in some tenuous way, any theoretical relevance would be far outweighed by the negative factors under Rule 403. Evidence must be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. All but the last of those factors apply here. A "trial" over whether Starling's behaviors were more likely caused by alcohol or something else would confuse the issues, mislead the jury, waste time, delay the trial, and prejudice Banner by making it

look like it needs to prove the etiology of Starling's behaviors, not just his BAC.

It is an open, important question whether Starling was "impaired *during work hours*." (Doc. 221-1, Ex. A at Ex. 1 at 13 of 19 (emphasis added).) The trial will decide that. Flaxmayer's testimony has no bearing on the question.

IT IS THEREFORE ORDERED that Banner Health's Motion to Exclude Testimony of Plaintiff's Expert Stan Smith (Doc. 216) is granted regarding Smith's report and testimony on hedonic damages. The motion is otherwise denied.

IT IS FURTHER ORDERED that Banner Health's Motion to Exclude Expert Testimony of Plaintiff's Expert Chester Flaxmayer (Doc. 221) is granted.

Dated: February 21, 2018.

_____
Neil V. Wake
Senior United States District Judge